EXHIBIT B

| | |
|---|---|
| **DISTRICT COURT OF THE 2ND JUDICIAL DISTRICT DENVER COUNTY, STATE OF COLORADO**<br>Court Address:   Denver City & County Building<br>                           1437 Bannock Street<br>                           Denver, Colorado<br>Phone Number:   720-865-8301 | DATE FILED<br>February 14, 2025 9:06 PM<br>FILING ID: A9CB4DDF96A52<br>CASE NUMBER: 2025CV30595 |
| Plaintiff:   **ALEXANDRIA ZAVALA, et al,**<br><br>v.<br><br>Defendant:   **CENTERSPACE, L.P.** | |
| *Legal Help in Colorado P.C.*<br>Ross Ziev, #43181<br>Joseph Martin, #60967<br>8480 E. Orchard Rd Ste 2400<br>Greenwood Village, CO 8011<br>(303) 351-2567<br>ross@helpincolorado.com<br>joseph@helpincolorado.com<br><br>*Krivit Law*<br>David Krivit, #25916<br>Melanie Sulkin, #49944<br>44 Cook Street, Ste. 100<br>Denver, CO  80206<br>(303) 800-1225<br>david@krivitlaw.com<br>melanie@krivitlaw.com | Case Number:<br><br>Courtroom/Division: |
| **CLASS ACTION COMPLAINT AND JURY DEMAND**<br>**AND**<br>**REQUEST FOR INJUNCTIVE RELIEF** | |

Plaintiff, Alexandria Zavala, by and through her attorneys, files this Class Action Complaint and Jury Demand and Request for Injunctive Relief against Defendant Centerspace, L.P. ("Centerspace"), on behalf of herself and on behalf of a class of similarly situated tenants, and alleges as follows:

## INTRODUCTION

1. This matter involves complaints from tenants of a residential building in Denver. The building, named "Civic Lofts," is a 14-story residential building located at 360 W. 13th Avenue, Denver, Colorado 80204.

2. This building is the only home for all of these tenants, families, children, pets and elderly that live in the building. Over the last 3 years, significant problems with the building began to develop, and have never been remedied. Recently, the problems have begun to increase and steamroll into the current situation where the building is not "habitable" pursuant to Colorado law. This Complaint seeks to provide fair and complete remedies to all affected tenants and class members, and seeks injunctive relief to prevent further erosion of Plaintiff's and all class member's rights.

## NATURE OF THE ACTION

3. In 2017, at a time when Denver was facing a massive housing crisis with record increases in rental pricing and massive population growth, Centerspace, LP, a publicly traded (NYSE: CSR) limited partnership out of Minneapolis, entered the Denver market by buying up homes and multi-family developments to rent out.[1]

4. In a January 5, 2022 press release, Centerspace, announced that it had paid $63 million to purchase Civic Lofts, a 2019 multi-family development consisting of 14 floors, 176 units and 1,600 square feet of street-level retail space.[2]

---

[1] https://denverchamber.org/policy/policy-housing-white-paper/
[2] https://www.prnewswire.com/news-releases/centerspace-announces-investment-activity-in-minneapolis-and-denver-301454937.html

5. With the addition of Civic Lofts, Centerspace, boasted ownership of 1889 homes in six communities in the Denver market.

6. In the same press release, Centerspace's President and CEO claimed: "In 2022 we will focus on the strategic priorities of enhancing our portfolio quality and resident experience, and growing distributable cash flow and core FFO while providing great homes for our residents, our team, and our investors."

7. However, as Centerspace's stock price sunk from $105.41 on January 5, 2022 to $60.99 at the end of January, 2025, the resident experience at Civic Lofts also declined.

8. Centerspace delegated utility management to a company called Conservice.

9. Conservice promotes itself as the nation's largest utility management service.

10. Conservice advertises that it can help multifamily housing providers "reduce costs, avoid late fees, and increase recovery."

11. Conservice was able to save money for Centerspace by forcing tenants to bare the unreasonable costs for the building that the tenants did not anticipate or contract for.

12. Conservice, on behalf of Centerspace, charges tenants junk fees not fully advertised on behalf of tenants.

13. Conservice charges tenants for trash and valet trash.

14. Conservice charges tenants for a boiler management fee.

15. Conservice charges tenants for an amenity fee for which Centerspace fails to adequately explain the basis.

16. Conservice charges tenants a water hearing fee.

17. Conservice charges tenants an unreasonable amount for common area gas and electricity which continues to increase without explanation.

3

18. When asked about the increase in costs, Centerspace and Conservice failed to adequately explain how costs were calculated.

19. Another significant issue has arisen as the Denver Fire code requires that apartment buildings, like Civic Lofts, receive an inspection before being granted the annually required Certificate of Operation.

20. On June 30, 2022, the Denver Fire Department notified Centerspace that the annual elevator safety inspections at Civic Lofts were past due.

21. When Civic Lofts did attempt to update its Certificate of Operation more than a year later, on September 15, 2023, Centerspace was told that it would not receive the annual Certificate of Operation because of the following violations:

    a. The Phase 1 Key Switch operation did not work. This switch is used by emergency personnel to provide emergency services during fire service;
    b. The elevator's emergency phone did not work. This was marked as a repeat violation;
    c. The escutcheon for the run/stop switch was reversed;
    d. The elevator pit was not kept clean. This was marked as a repeat violation;
    e. The elevator fire service was not tested or logged quarterly;
    f. The emergency phone was not tested or logged quarterly; and
    g. The category 1 (No-load safety test) was overdue.

22. Centerspace was issued a Temporary Certificate of Operation expiring on December 31, 2023 and was told to complete and return an affidavit showing that the violations were corrected within ninety (90) days.

23. Centerspace did not correct the violations within the required timeframe and continued to operate Civic Lofts without the required Certificate of Operation.

24. During the time that the elevators were without a Certificate of Operation, the elevators were rarely both functional.

25. During the time that the elevators were without a Certificate of Operation, elevator service to the building became slow and unreliable.

26. During the time that the elevators were without a Certificate of Operation, on occasion, residents were stuck in the elevators and unable to use the emergency equipment.

27. Centerspace was finally able to get a Certificate of Operation at some point.

28. Denver residential rental properties were required to obtain a Denver residential rental license after January 1, 2023. Denver, Colo., Mun. Code § 27-193.

29. As a requirement to obtain a residential rental license, properties are required to undergo a safety inspection. Denver, Colo., Mun. Code § 27-193.

30. Centerspace received multiple citations in 2023 for operating Civic Lofts without a residential rental license.

31. Centerspace leased apartments to tenants while knowing that Civic Lofts had either not received or failed annual elevator safety inspections required by the Denver Fire Department.

32. Centerspace leased apartments to tenants while knowing that Civic Lofts had not received a Denver residential rental license.

33. Centerspace leased apartments to tenants while knowing that Civic Lofts had not undergone the safety inspection required for the Denver residential rental license.

**PARTIES**

34. Plaintiff Alexandria Zavala is an individual tenant residing at Civic Lofts, 360 W. 13th Avenue, Apartment 1413, Denver, Colorado 80204.

35. Plaintiff Zavala's experiences and interactions with Civic Lofts and Defendants was identical or very similar to all other potential class members.

36. Defendant Centerspace, LP is a publicly traded foreign limited partnership with a principal office street address of 3100 10th Street SW, Minot, North Dakota, 58701.

## JURISDICTION AND VENUE

37. This Court has personal jurisdiction over Centerspace because Centerspace conducts significant, substantial, and not-isolated business activities in Colorado and a substantial portion of the acts complained of took place in Colorado.

38. The amount in controversy is less than $5,000,000.00.

39. Venue is proper in Denver under C.R.C.P. 98(c)(3)(B).

## CLASS ALLEGATIONS

40. Plaintiff brings this class action under C.R.C.P. 23 and seeks certification of the claims and issues in this action pursuant to the applicable provisions of C.R.C.P. 23.

41. The proposed classes is defined as:

> All lawful or rightful tenants at Civic Lofts, from the date Centerspace took possession of Civic Lofts through present.

42. Plaintiff reserves the right to amend or modify the Class definitions with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

43. Numerosity. C.R.C.P. 23(a)(1). Civic Lofts has 176 apartments, with several people living in some of those apartments. The exact size of the proposed class and the identity of all class members can be readily ascertained from Centerspace's records.

44. Commonality. C.R.C.P. 23(a)(2) and (b)(3). There are questions of law and fact common to the class, which questions predominate over any questions affecting only individual class members. Common issues include:

    a. Whether Centerspace knowingly leased out multi-floor residential housing with elevators that did not have a certificate of operation.
    b. Whether Centerspace knowingly leased out residential housing without the appropriate safety inspections and licenses required by the City of Denver.
    c. Whether Centerspace's third party vendor overcharged tenants for utilities.
    d. Whether Civic Lofts was uninhabitable pursuant to C.R.S. 38-12-201 et seq.
    e. Whether Centerspace purposefully and knowingly leased apartments without full amenities, security and health and safety protections.
    f. The nature of the relief, including equitable relief, to which Plaintiff and the class are entitled.

45. Typicality. C.R.C.P. 23(a)(3). Plaintiff's claims are typical of the claims of the Class it seeks to represent. Plaintiff and all Class members similarly suffered from Centerspace 's leasing practices, use of Conservice and uninhabitable conditions.

46. Adequacy of Representation. C.R.C.P. 23(a)(4) Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Further, Plaintiff's counsel is competent and experienced in litigating class actions.

47. Superiority. C.R.C.P. 23(b)(3). A class action is superior to any other available means for the fair and efficient adjudication of this controversy. The claims of Plaintiff and individual class members are small compared to the burden and expense that would be required to separately litigate their claims against Defendant, and it would be impracticable for class members to seek redress individually. Litigating claims individually would also be wasteful to the resources of the parties and the judicial system and create the possibility of inconsistent or contradictory judgments. Class treatment provides manageable judicial treatment which will bring an orderly and efficient

conclusion to all claims arising from Defendant's misconduct. Class certification is therefore appropriate under C.R.C.P. 23(b)(3).

48. Class certification is also appropriate under C.R.C.P. 23(b)(1), as the prosecution of separate actions by individual members of the class would create the risk of adjudications with respect to individual class members that would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication and substantially impair their ability to protect those interests.

49. Class certification is also appropriate under C.R.C.P. 23(b)(2), as Centerspace has acted and/or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief appropriate for the class.

**PLAINTIFF'S FIRST CLAIM FOR RELIEF**
**VIOLATIONS OF COLORADO'S IMPLIED WARRANTY OF HABITABILITY, COLO. REV. STAT. § 38-12-501 ET AL**

50. This action arises out of Centerspace's breach of Colorado's Implied Warranty of Habitability.

51. Centerspace is a landlord as defined by C.R.S. 38-12-502.

52. Pursuant to C.R.S. § 38-12-503, in every rental agreement, the landlord is deemed to warrant that the residential premises is fit for human habitation at the inception of the tenant's occupancy and that the landlord will maintain the residential premises as fit for human habitation throughout the entire period that the tenant lawfully occupies the residential premises or dwelling unit.

53. Throughout her tenancy, Plaintiff has been subjected to uninhabitable conditions as defined by C.R.S. 38-12-505 including:

8

    a. Common areas and areas under the control of the landlord that are not kept reasonably clean, sanitary, and free from all accumulations of debris, filth, rubbish, and garbage;
    b. Lack of an adequate number of appropriate exterior receptacles for garbage, waste, and rubbish, in good repair and scheduled to be serviced and emptied at sufficient intervals to ensure containment and proper disposal of all trash, waste, and rubbish;
    c. Elevators not working at all and not maintained in good repair;
    d. Locks on exterior doors not maintained in good repair;
    e. Lack of compliance with applicable building, housing and health codes.
    f. Hidden and unreasonable fees.

54. The Premises is uninhabitable pursuant to C.R.S. § 38-12-505.

55. The uninhabitable conditions materially interfere with the Plaintiff's life, health and safety.

56. Centerspace had notice of the uninhabitable conditions as described in C.R.S. § 38-12-503(3)(e).

57. Pursuant to C.R.S. § 38-12-503(2)(b)(I)(A), a landlord is required to begin remedial action within a period of twenty-four (24) hours when a condition materially interferes with a tenant's life, health or safety, or seventy-two (72) hours when the condition otherwise makes the premises uninhabitable.

58. Centerspace has not complied with C.R.S. § 38-12-503(2)(b)(I)(A).

59. Pursuant to C.R.S. § 38-12-503(3)(a), there is a rebuttable presumption that the landlord has failed to address the uninhabitable condition within a reasonable time if the landlord has:

    a. Failed to communicate with the tenant within twenty-four (24) hours of receiving notice;
    b. The condition continues to exist seven (7) calendar days after the landlord received notice of the condition where the condition materially interferes with the tenant's life, health, or safety; or

      c. The condition continues to exist fourteen (14) calendar days after the landlord received notice of a condition that otherwise makes the premises uninhabitable.

60. As a direct result of Defendant's failures under the statute, Plaintiff has suffered and will continue to suffer actual damages including loss of property, moving expenses, having to provide a new security deposit to move out, attorney fees and other out of pocket expenses.

61. As a direct result of Defendant's failures under the statute, Plaintiff has suffered emotional damages including inconvenience, emotional stress, and impairment of the quality of life.

62. Centerspace has consciously disregarded the known risk of leaving Plaintiff subjected to the identified uninhabitable conditions.

63. Pursuant to C.R.S. § 38-12-507(1)(d), a tenant may recover actual damages arising from the breach of warranty of habitability, a reduction in the fair rental value of the premises during the uninhabitable period, court costs, reasonable attorney fees, punitive damages and any other damages ordered by the Court.

64. Pursuant to C.R.S. § 38-12-503(4)(a)(II), if the condition materially interferes with the tenant's life, health, or safety, the landlord must provide the tenant:

    (A) A comparable dwelling unit, as selected by the landlord, at no cost to the tenant; or

    (B) A hotel room, as selected by the landlord, at no cost to the tenant.

65. Pursuant to C.R.S. § 38-12-503(4)(b), a comparable dwelling unit or hotel room must include:

    a. The same number of beds as there are beds in the tenant's unit; and
    b. If required for more than forty-eight hours:
        i. The comparable dwelling unit or hotel room must include a refrigerator with a freezer and a range stove or oven; or

      ii. The landlord must provide a per diem for daily meals and incidentals for each tenant in an amount that is at least equal to the Colorado state employee per diem for intrastate travel as established by the department of personnel. The landlord must provide the per diem to the tenant at the time the landlord reasonably expects the tenant to be in a comparable dwelling unit or hotel room for more than forty-eight hours and for every twenty-four-hour period thereafter.

66. Currently, the per diem amount for intrastate travel as established by the department of personnel is $92, per person, per day.

67. Defendant has failed to provide all of its statutory requirements.

### PLAINTIFF'S SECOND CLAIM FOR RELIEF
### TEMPORARY RESTRAINING ORDER PURSUANT TO COLO. REV. STAT. § 38-12-507(1)(f) AND C.R.C.P. 65

68. Plaintiff incorporates the allegations of the preceding paragraphs.

69. Pursuant to C.R.S. § 38-12-507(1)(f)(I), a tenant may obtain an immediate temporary restraining order without notice to the landlord in any county court or district court of competent jurisdiction, which shall require the landlord to comply with Colorado's Warranty of Habitability.

70. Pursuant to C.R.S. § 38-12-507(1)(f)(II), the tenant's request for an immediate temporary restraining order that requires the landlord to comply with Colorado's Warranty of Habitability Law may be issued if the court finds, from specific facts shown by the tenant's affidavit, verified complaint, or testimony, that:

    (A) The tenant's dwelling unit is in a condition that materially interferes with the tenant's life, health, or safety;
    (B) The landlord has notice of the condition;
    (C) The landlord has failed to comply with Colorado's Warranty of Habitability Law; and
    (D) The tenant certifies to the court in writing or on the record any efforts the tenant has made to obtain the landlord's compliance with Colorado's Warranty

11

of Habitability Law.

71. Plaintiff seeks the following temporary restraining relief:

    a. A 24-hour on-site person to manage the building.
    b. A 24-hour on-site security guard.
    c. Functioning security cameras with a 7 day minimum maintenance of footage.
    d. An industrial hazard cleaning company to immediately clean the stairwells to remove feces and urine and to clean on a regular basis.
    e. Hire a full-time elevator maintenance company with 24-hour on call capabilities.
    f. Update all elevators with communication equipment.
    g. Maintain a daily log of elevator functioning.
    h. Halt the signing of any new leases until both elevators work consistently for 14 days.
    i. Fix all exterior doors so that they close and lock properly, and so that all electronic entry systems are functioning properly.
    j. Halt the collection of excess fees that have not been agreed to in writing.
    k. Assign a dedicated email address for building maintenance and concerns
    l. Allow the breaking of leases for any person without penalty up to April 1, 2025.
    m. Pay for moving expenses of anyone seeking to break lease due to building condition.
    n. Arrangement of temporary housing for all tenants who qualify under the statute.

72. Pursuant to C.R.S. § 38-12-507(1)(f)(III), a tenant is not required to post security or provide proof of irreparable injury, loss, or damage for a temporary restraining order.

73. Pursuant to C.R.S. § 38-12-507(1)(f)(IV), a court of competent jurisdiction shall consider and rule on any motion for an immediate temporary restraining at the earliest possible time, and the motion takes precedence over all matters except older motions for immediate temporary restraining orders.

## PLAINTIFF'S THIRD CLAIM FOR RELIEF
## BREACH OF CONTRACT

74. Plaintiff incorporates the allegations of the preceding paragraphs.

75. In the Civic Lofts leases, Centerspace is required to maintain the apartment, including the structure and electrical in reasonable repair and in compliance with applicable health and safety laws.

76. Centerspace has not maintained Civic Lofts in reasonable repair, including the elevators and electrical components used with the elevators.

77. Centerspace has not maintained the exterior fire doors.

78. Centerspace has not complied with applicable safety laws requiring safety inspection of Civic Lofts in order to receive a residential rental license.

79. Centerspace has not charged reasonable fees.

80. Centerspace has not complied with applicable elevator safety requirements.

81. Centerspace breached these portions of the lease.

82. Plaintiff has been directly damaged by Centerspaces breaches by the excess amount of the reasonable fees, by incurring additional consequential damages and expenses, and by paying full price for an apartment that has less value than a comparable apartment with properly functioning equipment, safety and health standards and reasonable fees.

**PLAINTIFF'S FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT**
**COLO. REV. STAT. § 6-1-101 ET SEQ.**

78. Plaintiff incorporates the allegations of the preceding paragraphs.

79. C.R.S.A. § 6-1-102 (Colorado Consumer Protection Act "CCPA") defines "advertisement" as:

13

> "Advertisement" includes the attempt by publication, dissemination, solicitation, or circulation, visual, oral, or written, to induce directly or indirectly any person to enter into any obligation or to acquire any title or interest in any property.

80. At all times relevant, Centerspace has published and disseminated "advertisements" regarding its apartment and services through numerous media, including websites, printed information, oral statements by its agents and other electronic methods.

81. C.R.S.A. § 6-1-105 states that a person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person commits one of the statutes' enumerated acts or omissions.

82. Centerspace has violated the Colorado Consumer Protection Act, including, but not limited to the following acts and omissions.

**83. C.R.S.A. 6-1-105 (b).  Either knowingly or recklessly makes a false representation as to the source, sponsorship, approval, or certification of goods, services, or property.**

   a. Centerspace violated this section by representing that Civic Lofts was properly approved and certified by all relevant governmental agencies, while specifically knowing that it did not have a proper Rental License nor proper Certificates of Operation for the elevators.
   b. Centerspace violated this section by advertising and renting apartments when it knew that it could not legally do so because of the missing license and certificates.
   c. Centerspace received citations and was also told by the Denver Fire Department specifically what items needed to be fixed in order to obtain the certificate. Centerspace failed to remedy these items, thus it knew that it was still not in compliance when it continued to sign leases.
   d. The repair items noted by the Fire Department included many maintenance items which Centerspace knew of and had a duty to complete.  Centerspace did not complete these items and did not notify their tenants that they were not in compliance.

84. **C.R.S.A 6-1-105 (e).  Either knowingly or recklessly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith.**

    a. Centerspace violated this section by knowingly or recklessly advertising, communicating and promising potential tenants that the building was legally habitable, that it had the approval of all governmental agencies to operate the building and the elevators; that they would have the benefit of two working elevators and that they would have all of the amenities and security they were promised.
    b. Throughout her tenancy, Plaintiff has been subjected to uninhabitable conditions as defined by C.R.S. 38-12-505 including: common areas not kept reasonably clean, sanitary, and free from all accumulations of debris, filth, rubbish, and garbage; lack receptacles for garbage, unlocked exterior doors; broken doors, missing security camera footage, hostile approaches from homeless persons inside the building and elevators not maintained in good repair;
    c. As a result of the totality of these issues, the building is uninhabitable pursuant to C.R.S. § 38-12-505.

85. **C.R.S.A 6-1-105 (g).  Represents that goods, food, services, or property are of a particular standard, quality, or grade, or that goods are of a particular style or model, if he knows or should know that they are of another.**

    a. Centerspace violated this section by advertising the building on its website as, "ultra-modern . . . modern functionality . . . luxury living at our pet-friendly building . . . online resident portal . . . on-site management . . . electronic gated entrance."  Centerspace knew that these statements were false.

86. **C.R.S.A 6-1-105 (i). Advertises goods, services, or property with intent not to sell them as advertised.**

    a. Centerspace admitted in a community meeting that they had prior knowledge that the building did not have its license or certificates, and thus that the building ws not technically habitable, before they entered into leases.  Thus, they clearly had the intent not to sell leases as advertised.

15

87. **C.R.S.A 6-1-105 (*l*). Makes false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions.**

    a. Centerspace violated this section by making misleading statements of fact concerning the fees and utility prices that tenants would pay at Civic Lofts while knowing that the prices would be much higher.
    b. Centerspace provided false or misleading information regarding fees for garbage, parking, electricity, trash, valet, boiler management, amenities, water heating fee, and common area gas and electricity.
    c.

88. **C.R.S.A 6-1-105 (n) Employs "bait and switch" advertising, which is advertising accompanied by an effort to sell goods, services, or property other than those advertised or on terms other than those advertised and which is also accompanied by one or more of the following practices:**

. . .

**(VII) Failure to make deliveries of the goods, property, or services within a reasonable time or to make a refund therefor;**

    a. Centerspace violated this section by Employing 'bait and switch' advertising by attempting to rent out Civic Lofts to Denver tenants but failing to provide working elevators or a legal residential rental within a reasonable time. Centerspace baited tenants with a legally approved residence with legally safe and working elevators, security, security doors and security cameras. However, Centerspace switched that with a building with none of those items.

89. **C.R.S.A 6-1-105 (u). Fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction.**

    a. Centerspace violated this section by failing to disclose material information concerning the operational status of the elevators, the safety inspections and the Denver residential rental license in order to induce tenants to lease from Centerspace.
    b. The failure was intended to induce signing because no reasonable tenant would sign a lease for an apartment without a rental license or elevator certificate.

90. **C.R.S.A 6-1-105 (z). Refuses or fails to obtain all governmental licenses or permits required to perform the services or to sell the goods, food, services, or property as agreed to or contracted for with a consumer.**

    a. Centerspace violated this section by representing that Civic Lofts was habitable while knowing that it did not have the safety inspections that would show that it was habitable.
    b. Centerspace violated this section by representing that Civic Lofts was a legal Denver residential rental space when it knew that it could not legally rent units because it did not have the proper permits.
    c. Centerspace violated this section by failing to obtain all governmental licenses or permits required to safely and legally operate Civic Lofts as a residential housing rental.

91. All of the foregoing violations occurred in the course of Centerspace's business.

92. The violations significantly impacted the public as actual or potential tenants of Centerspace's housing. Many members of the public responded to Centerspace's advertising and promises and then signed leases. Centespace continues to market itself to the general public.

93. Plaintiff, and the those similarly situated, are actual consumers of Centerspace's rental housing.

94. Centerspace's violations caused actual damages to the Plaintiff and those similarly situated. Such damages include, but are not limited to: fear, anxiety, loss of time, loss of enjoyment of life, increased expenses for living, the difference in value of what was paid

for rent and what a reasonable price for a similar apartment would be, and increased and unfair fees and charges.

WHEREFORE, Plaintiff seeks judgment against Defendant as stated below:

## PRAYER FOR RELIEF

Plaintiff seeks an immediate hearing to order injunctive relief as follows:

1. All relief enumerated in Paragraph 69 of this Complaint.
2. Payment for: reimbursement for rent for months where the apartment was not habitable; reimbursement for all hidden and surprise fees, and all unreasonable fees; reimbursement for any related additional expenses, reimbursement for the reduction in fair rental value of the apartment; reimbursement for moving costs;
3. All damages allowed by law under any statute or common law cited herein or otherwise applicable;
4. Noneconomic damages for inconvenience, emotional stress and impairment of the quality of life;
5. Defendant shall pay Plaintiff's reasonable attorneys' fees and costs;
6. Any and all other relief deemed appropriate by this Court.

Dated this 14th day of February 2025.

Respectfully submitted,

*/s/ David W. Krivit*_____
David W. Krivit, #25916
Attorney for Plaintiff

/s/ *Ross Ziev*_____
Ross Ziev #43181
Attorney for Plaintiff

*In accordance with C.R.C.P. 121, §1-26(9), a printed copy of this document with original signatures is being maintained by the filing party and will be made available for inspection by other parties or the Court upon request.*